**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ABRAHAM FLAXMAN, individually and for a proposed class; AMY HAGOPIAN, individually and for a proposed class, | No. 24-919 |
| | D.C. No. 2:23-cv-01581-KKE |
| *Plaintiffs - Appellants*, | |
| v. | OPINION |
| BOB FERGUSON, in his official capacity as the Attorney General of the State of Washington; KATE REYNOLDS, Kate Reynolds in her official capacity as Executive Director of the Executive Ethics Board of the State of Washington, | |
| *Defendants - Appellees*. | |

Appeal from the United States District Court
for the Western District of Washington
Kymberly K. Evanson, District Judge, Presiding

Argued and Submitted December 4, 2024
San Francisco, California

Filed August 22, 2025

2                FLAXMAN v. FERGUSON

Before: Mark J. Bennett, Daniel A. Bress, and Danielle J.
Forrest, Circuit Judges.

Opinion by Judge Bress;
Dissent by Judge Bennett

## SUMMARY[*]

### First Amendment/Ripeness

The panel reversed the district court's judgment
dismissing as unripe a lawsuit brought by two University of
Washington professors challenging the investigatory
policies of the Washington State Executive Ethics Board
after the Board investigated the professors for misusing their
state email addresses.

The Board investigated the professors after they
forwarded to a faculty listserv several emails that allegedly
contained political discussion and fundraising requests. In
conducting the investigations, the Board reviewed several
months' worth of the professors' emails. The Board
ultimately did not discipline one professor, but it fined the
other professor. In their lawsuit, the professors, on behalf of
themselves and a putative class of listserv subscribers,
alleged that the Board's policies and practices chilled the
exercise of their First Amendment rights.

---

[*] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

FLAXMAN V. FERGUSON 3

The panel held that the district court erred in dismissing the professors' lawsuit as unripe under Article III. The professors' allegations that the Board's policies will chill their speech are ripe under a pre-enforcement challenge framework because the professors remain affiliated with the University, they are the moderators of the listserv, the Board's policies are alleged to remain in place, and the Board's history of enforcement demonstrates a plausible and reasonable fear of prosecution. To the extent the professors also advanced a retaliation theory based on past events, their claim is ripe because the professors have already been injured under a regime that has penalized them for their speech to the listserv.

The panel further held that the district court erred by concluding that the professors' claims were prudentially unripe. The professors' claims are fit for judicial decision because the issues are primarily legal, involving the Board's investigatory policies that have already been applied to the professors. Moreover, withholding review would impose a substantial hardship on the professors.

Because the professors' claims are ripe, the panel reversed the district court's dismissal of their complaint and remanded for further proceedings.

Judge Bennett dissented because in his view the professors' complaint failed to plead an injury in fact that confers standing under either a pre- or post-enforcement framework. However, because facts on the ground material to the prudential ripeness analysis changed during the pendency of this appeal, he would remand to allow the professors to amend their complaint.

4            FLAXMAN V. FERGUSON

**COUNSEL**

Joel A. Flaxman (argued) and Kenneth N. Flaxman, Kenneth N. Flaxman PC, Chicago, Illinois; Jay Gairson, Gairson Law LLC, Seattle, Washington; for Plaintiffs-Appellants.

Andrew R.W. Hughes (argued), Attorney; Nathan K. Bays, Assistant Attorney General; Robert W. Ferguson, Attorney General; Office of the Washington Attorney General, Seattle, Washington; for Defendants-Appellees.

**OPINION**

BRESS, Circuit Judge:

The Washington State Executive Ethics Board investigated two University of Washington professors for misusing their state email addresses after they forwarded to a faculty listserv several emails that allegedly contained political discussion and fundraising requests. In conducting the investigations, the Ethics Board reviewed several months' worth of the professors' emails. The Board ultimately did not discipline one professor, but it fined the other $750. The professors seek to invalidate certain of the Ethics Board's investigatory policies as contrary to the First Amendment. The district court dismissed the suit as unripe. We reverse and remand for further proceedings.

I

Washington's Ethics in Public Service statute, Wash. Rev. Code § 42.52, prohibits state employees, including University of Washington professors, from using state resources "for the private benefit or gain of the officer,

employee, or another." Wash. Rev. Code § 42.52.160(1). Another section of the statute prohibits the use of public resources for political campaigns, defined as acts taken "for the purpose of assisting a campaign for election of a person to an office or for the promotion of or opposition to a ballot proposition." *Id.* § 42.52.180(1). Washington's Executive Ethics Board is charged with enforcing the law as to institutions of higher education. *Id.* § 42.52.360(1). It may issue sanctions for violations, including reprimands and monetary penalties. *Id.* § 42.52.360(3)(e).

Abraham Flaxman and Amy Hagopian are professors at the University of Washington. They are the primary moderators of the University's "Faculty Issues and Concerns" email listserv, to which more than 2,000 other instructors subscribe. The listserv is designed to provide a forum for faculty members to share information of general concern to those in higher education. Before an email can be forwarded to the full mailing list, it must be approved by a moderator. Moderators do not screen emails for content or subject matter, but they do seek to exclude emails containing personal attacks or extensive back and forth exchanges, to ensure that recipients' inboxes are not overwhelmed.

In December 2022, the Ethics Board received an anonymous complaint alleging that Flaxman used public resources for political purposes when he forwarded to the listserv an email about Whole Washington, a campaign to bring universal healthcare to Washington state. Even though Flaxman admitted to forwarding the email, the Ethics Board, as part of its investigation, gained access to all of Flaxman's emails for the surrounding three-month period. The Board's email review was not limited to emails that Flaxman forwarded to the listserv; the Board instead reviewed all his emails over that time span. After notifying Flaxman of the

anonymous complaint and receiving his response, the Ethics Board eventually concluded there was reasonable cause to believe that Flaxman had violated the Ethics in Public Service law and that the penalty "may be more than $500." After Flaxman retained counsel, the Board reconsidered its determination and terminated the matter in Flaxman's favor.

In June 2023, the Ethics Board received another anonymous complaint about Flaxman forwarding an email to the listserv. The email concerned a potential strike by University of Washington research scientists and postdoctoral scholars. The email contained a list of ways to support the striking colleagues, including by donating to their "hardship fund." After investigating the matter, including another review of Flaxman's email files over the relevant three-month period, the Ethics Board found that Flaxman had again violated Washington's Ethics in Public Service law, but that the violation was minor and did not warrant discipline.

The Ethics Board investigated Professor Hagopian based on similar allegations. In December 2022, the Board received an anonymous complaint alleging that Hagopian used public resources for political campaigns after she forwarded to the listserv an email about a strike of researchers and graduate students in the University of California system. The email asked for support with elected officials and on social media, and it provided a link to donate to a "strike fund."

After notifying Hagopian of the complaint, reviewing her response, and reviewing her email files (over 2,000 emails), the Ethics Board found that Hagopian had improperly used state resources to solicit donations. The Board also found that Hagopian had used her state email for

private benefit, in violation of Wash. Rev. Code § 42.52.160. This determination was based on emails retrieved from Hagopian's account, including an electronic boarding pass, news alerts from the Seattle Times and New York Times, and promotional emails from companies such as eBay, Levi's, and Delta Airlines. While this appeal was pending, the Ethics Board issued a final decision fining Hagopian $750.[1]

Flaxman and Hagopian filed this lawsuit in October 2023, on behalf of themselves and a putative class of listserv subscribers. Their operative amended complaint alleged that the Ethics Board's policies and practices in enforcing the Ethics in Public Service law chill listserv subscribers' exercise of First Amendment rights. The complaint focuses specifically on the following Board practices: its allowance of anonymous complaints, its broad searches of professors' emails during investigations, its treatment of incidental financial solicitations in emails as violative of state law, and its levying of allegedly excessive and disproportional monetary penalties. The complaint seeks to enjoin these policies, which "have the effect of restricting the content of statements that may be shared on the 'Faculty Issues and Concerns' mailing list."

The district court dismissed the complaint under Federal Rule of Civil Procedure 12(b)(1), concluding that the

---

[1] Although they post-dated the complaint, we may take judicial notice of the Ethics Board's final decisions in Hagopian's case and in the second Flaxman proceedings because they are matters of public record. Fed. R. Evid. 201; *Mont. Green Party v. Jacobsen*, 17 F.4th 919, 927–28 (9th Cir 2021). These Ethics Board decisions are not in dispute. Indeed, it is the State that filed both decisions with us on appeal. In any event, our determination that this case is ripe does not depend on the outcome of these proceedings.

FLAXMAN V. FERGUSON

professors' claims were unripe under Article III. The court concluded that the professors did not allege that the Ethics Board's policies had chilled their speech. And as to the email searches, the court reasoned that "Plaintiffs' emails are public records because they are public employees," which meant that the professors "do not have a First Amendment privacy interest in them that is violated by disclosure to the Executive Ethics Board." The district court further concluded that the professors' claims were prudentially unripe because Ethics Board investigations against both professors were ongoing.

The professors appealed. We review the district court's Rule 12(b)(6) dismissal of plaintiffs' complaint de novo, taking the allegations as true and drawing all reasonable inferences in plaintiffs' favor. *Manzarek v. Saint Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1030–31 (9th Cir. 2008).

## II

The district court erred in dismissing the professors' lawsuit as unripe.

### A

Article III's ripeness doctrine is designed to "prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148 (1967)). To protect against judicial engagement in hypothetical or speculative disputes, "[a] claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas*, 473 U.S. at 580–81).

Constitutional ripeness equates with Article III's injury-in-fact requirement for standing. *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014); *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1173 (9th Cir. 2022); *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010). The well-worn prerequisites are "an invasion of a legally protected interest that is (a) concrete and particularized[,] and (b) actual or imminent, not conjectural or hypothetical." *Twitter*, 56 F.4th at 1173 (alteration in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

But in the First Amendment context, because of the nature of the interests at stake, "we apply the principle that one need not await 'consummation of threatened injury' before challenging a statute restricting speech, to guard the risk that protected conduct will be deterred." *Wolfson*, 616 F.3d at 1058 (quoting *Ariz. Right to Life PAC v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003)). For these sorts of pre-enforcement challenges, the "inquiry focuses on (1) whether the plaintiffs have articulated a concrete plan to violate the law in question, (2) whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and (3) the history of past prosecution or enforcement under the challenged statute." *Twitter*, 56 F.4th at 1174 (quoting *Alaska Right to Life Pol. Action Comm. v. Feldman*, 504 F.3d 840, 849 (9th Cir. 2007)); *see also Susan B. Anthony List*, 573 U.S. at 158–59. As the Supreme Court recently reiterated, for a First Amendment pre-enforcement challenge, the plaintiff need only "show that 'the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2358 (2025) (quoting *Susan B. Anthony List*, 573 U.S. at 158).

10            FLAXMAN V. FERGUSON

The professors allege that the Ethics Board policies will chill their speech, and so they are bringing a pre-enforcement challenge. Examining the complaint under that framework, it is clear their claim is ripe. In asserting a "credible threat of enforcement," a plaintiff "must allege 'an intention to engage in a course of conduct arguably affected with a constitutional interest,'" the "intended future conduct must be 'arguably . . . proscribed by'" the law in question, and "the threat of future enforcement must be 'substantial.'" *Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 59 (9th Cir. 2024) (quoting *Susan B. Anthony List*, 573 U.S. at 161–62, 164).

The professors easily clear these hurdles. They remain affiliated with the University. They allege they are the moderators of the listserv, which requires them to decide whether or not to send emails that may be deemed to violate Ethics Board policies. There is no suggestion that plaintiffs do not intend to continue as moderators or faculty members, and that is a reasonable inference (and indeed, the only apparent inference) of the plaintiffs' complaint. The Ethics Board's challenged policies, meanwhile, are alleged to remain in place. The State "ha[s] not disavowed enforcement if [the professors] make similar statements in the future." *Susan B. Anthony List*, 573 U.S. at 165. And the Board's history of enforcement is more than sufficient to demonstrate a "plausible and reasonable fear of prosecution," *Wolfson*, 616 F.3d at 1062 (emphasis omitted), especially when enforcement can result from anonymous complaints, *see Susan B. Anthony List*, 573 U.S. at 164 ("The credibility of th[e] threat is bolstered by the fact that authority to file a complaint with the Commission is not limited to a prosecutor or agency.").

We have said that "[i]n the context of First Amendment speech, a threat of enforcement may be inherent in the challenged statute, sufficient to meet the constitutional component of the ripeness inquiry." *Wolfson*, 616 F.3d at 1059. In this case, we do not need to derive a threat of enforcement from the statute when we know that the Ethics Board has already enforced the statute, against these plaintiffs no less, using the very policies that plaintiffs claim violate the First Amendment. As the Supreme Court has explained, "past enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'" *Susan B. Anthony List*, 573 U.S. at 164 (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)). The dispute before us is therefore neither abstract nor premature.

To the extent the professors are also advancing a retaliation theory based on past events, rather than solely bringing a pre-enforcement challenge, their claim is ripe from that perspective as well. When "the plaintiff challenges a state action that has been taken against the plaintiff," we do not consider the threat of enforcement, but simply "focus[] directly" on the requirements for Article III standing. *Twitter*, 56 F.4th at 1174. Here, the professors were injured under a regime that has penalized them for their speech to the listserv, subjecting the professors to investigations, an allegedly intrusive and excessive review of their emails, and enforcement proceedings, with the Board levying a $750 fine on Hagopian. There is nothing abstract, hypothetical, or premature about events that have already happened. *See Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 836–37 (9th Cir. 2012) ("We require a 'threat of prosecution' to ensure that the plaintiff challenging a statute can 'demonstrate a realistic danger of

sustaining a direct injury as a result of the statute's operation or enforcement.' In this case, that injury has already occurred, thereby eliminating any concerns that Plaintiffs' fear of enforcement is purely speculative." (citation omitted) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979))).

The State argues, and the district court agreed, that the professors' complaint was unripe because the professors did not allege that the Ethics Board's policies chilled their speech. But insofar as the professors were challenging the Board's "'retaliatory actions' after the fact for having engaged in" allegedly protected First Amendment activity, *Twitter*, 56 F.4th at 1174 (quoting *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022)), no authority required them to more specifically allege present or future chilling to demonstrate a ripe dispute.

Regardless, the complaint does allege chilling sufficient to proceed under the pre-enforcement framework. The complaint alleges, for example, that the Ethics Board allowing anonymous complaints "encourages and has resulted in the submission of complaints to intimidate and silence discussion of specific topics on the 'Faculty Issues and Concerns' mailing list." The complaint asserts that the Board's "overbroad email search[es] chill[] academic discussions" on the listserv. And it alleges that in applying a "zero tolerance standard"—by which any mention of an "incidental request for financial contributions" in a forwarded email triggers sanctions—the Board has likewise "chill[ed] the exercise of First Amendment rights" by faculty members. Nothing further was required for plaintiffs to plead a ripe First Amendment claim. *See Mahmoud*, 145 S. Ct. at 2358 ("[W]hen a deprivation of First Amendment

rights is at stake, a plaintiff need not wait for the damage to occur before filing suit.").

To the extent the State's position is that the professors had to allege some specific speech they would have made but for the challenged policies, the State again identifies no authority that would impose this sort of pleading obligation as an Article III prerequisite. *See id.* (rejecting contention that plaintiffs' allegations were insufficiently specific to allow a pre-enforcement challenge and rejecting a "wait and see" approach). It hardly takes imagination to conclude that a state Ethics Board that investigates anonymous complaints about forwarded emails, reviews months' worth of faculty emails in the process, and then threatens and imposes monetary fines and other sanctions based on allegedly minute references to monetary contributions, creates a genuine "risk of a chilling effect." *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 618 (2021); *see also 303 Creative LLC v. Elenis*, 600 U.S. 570, 580–82 (2023). That is not only a reasonable inference to draw from the professors' complaint, but an inevitable one. The entire thrust of the complaint is that the Ethics Board's policies have created First Amendment harm and pose a threat of imminent future First Amendment harm. There is clearly a live controversy in this case.

The dissent's contrary approach, which would effectively require plaintiffs to allege magic words in their complaint, fails to draw all reasonable inferences in plaintiffs' favor. The dissent claims plaintiffs have not alleged the Board's policies will chill their speech specifically, but why treat the complaint as excluding the very professors who brought it? The dissent similarly claims the plaintiffs have not specifically alleged their intended future conduct, but what else is the point of a complaint that

14          FLAXMAN v. FERGUSON

alleges plaintiffs' roles in the present tense and repeatedly alleges that the Board's policies will chill speech? Not even the State makes such fine-grained arguments against plaintiffs' ability to maintain this suit. Only by reading the plaintiffs' complaint in the least charitable light can the dissent find that professors who were investigated for their speech lack standing to complain about speech-restricting rules that continue to govern them.

The State's reliance on our decision in *Twitter v. Paxton* is also misplaced. In that case, Twitter claimed that a Texas Attorney General civil investigative demand seeking documents about Twitter's content moderation practices chilled the company's protected content moderation decisions. 56 F.4th at 1172–73. We held that Twitter's First Amendment challenge was not ripe because the civil investigative demand for documents did not give rise to a live First Amendment injury. Twitter's allegations, we held, were "vague" and "refer[red] only to a general possibility of retaliation." *Id.* at 1175. The notion that the civil investigative demand would affect Twitter's content moderation decisions was "too indefinite" and "highly speculative." *Id.* And the civil investigative demand was "not self-enforcing," meaning that Twitter was "speculat[ing] about injuries that have not and may never occur." *Id.* 1176.

*Twitter* concerned the tenuous link between a civil investigative demand for documents and the allegation that this demand in and of itself would chill speech. This case is quite different, with plaintiffs already having been subject to investigation and enforcement actions concerning their speech, under a regime that directly penalizes speech. In *Twitter*, moreover, Twitter had yet to "face[] any penalties for its refusal to comply with" the request for documents,

and the Texas Attorney General "ha[d] not alleged that the law has been broken." *Id.* at 1176–77. That is again not the case here, where the Ethics Board has found that both plaintiff professors violated Washington law, to the point that one was ordered to pay monetary penalties. *Twitter* does not govern here.

Finally, the district court found that the professors' lawsuit was constitutionally unripe because "as to the email searches, Plaintiffs' emails are public records because they are public employees." In the district court's view, this meant that the professors "do not have a First Amendment privacy interest in [the emails] that is violated by disclosure to the Executive Ethics Board." The professors' claims are not limited to the email searches, so this reasoning was insufficient to support the conclusion that the entire case was unripe.

But this reasoning was also incorrect, and the dissent is therefore incorrect to endorse it. Although the district court treated the professors' status as public employees as relevant to whether they had alleged an injury in fact, the professors contend that the First Amendment overrides any state law that would authorize the Ethics Board to search the professors' email accounts in the manner that it did. Whether or not this is correct is a merits question, not a question of ripeness. We express no views on the merits of the professors' First Amendment challenge. But the fact that they are public employees only tees up the First Amendment issue; it does not demonstrate that the professors' lawsuit is premature or speculative under Article III.

B

The district court also concluded that the professors' claims were prudentially unripe. Unlike Article III ripeness,

"[p]rudential considerations of ripeness are discretionary." *Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. Labrador*, 122 F.4th 825, 840 (9th Cir. 2024) (alteration in original) (quoting *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1142 (9th Cir. 2000)). The Supreme Court has observed that prudential ripeness thus may be "in some tension with . . . the principle that 'a federal court's obligation to hear and decide' cases within its jurisdiction 'is virtually unflagging.'" *Susan B. Anthony List*, 573 U.S. at 167 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014)). But setting aside these larger questions about the "continuing vitality" of the prudential ripeness doctrine, *id.*, we hold that under current doctrine, the district court erred in finding the professors' claims prudentially unripe.

Prudential ripeness turns on two considerations: (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration." *Ass'n of Irritated Residents v. U.S. Env't Prot. Agency*, 10 F.4th 937, 944 (9th Cir. 2021) (quoting *Abbott Lab'ys*, 387 U.S. at 149). As to the former, "pure legal questions that require little factual development are more likely to be ripe." *Planned Parenthood Great Nw.*, 122 F.4th at 840 (quoting *San Diego Cnty. Gun Rts. Comm. v. Reno*, 98 F.3d 1121, 1132 (9th Cir. 1996)). In this context, "[r]elevant considerations include 'whether the administrative action is a definitive statement of an agency's position; whether the action has a direct and immediate effect on the complaining parties; whether the action has the status of law; and whether the action requires immediate compliance with its terms." *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 752 (9th Cir. 2020) (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir.

2009)). These factors point overwhelmingly in favor of ripeness, as the issues are primarily legal, involving specific Ethics Board investigatory policies that have already been applied to these plaintiffs. *See Oklevueha Native Am. Church of Haw.*, 676 F.3d at 838 (holding that case was prudentially ripe because "[i]n contrast to cases in which the courts are left to hypothesize about how the law might be applied, Plaintiffs' claims arise from an enforcement action that has already occurred").

Because the issues are fit for judicial decision, we need not reach the hardship consideration to conclude that this case is prudentially ripe. *See id.* Even so, we conclude that withholding judicial review would impose a substantial hardship on the professors, who have been investigated and punished for their allegedly protected speech, and who are subject to an Ethics Board regime that will continue to do so going forward, including through substantial reviews of the professors' email files. That is sufficient to establish hardship for purposes of prudential ripeness. *See, e.g.*, *Planned Parenthood Great Nw.*, 122 F.4th at 840; *Tingley v. Ferguson*, 47 F.4th 1055, 1070–71 (9th Cir. 2022).

In concluding that the professors' claims were prudentially unripe, the district court seemingly adopted the State's theory that the inquiry turned on whether the Ethics Board was still investigating Flaxman and Hagopian. After the district court issued its decision, however, the Ethics Board concluded its proceedings as to both professors. The district court's ground for decision thus no longer stands, as the State appears to agree.

Regardless, the district court's rationale was also incorrect as of the time of decision because the professors' claims did not depend on the outcome of the Ethics Board

proceedings. Irrespective of how those proceedings ended, the professors had already endured allegedly unconstitutional Ethics Board investigations and faced a genuine risk of future investigation and punishment, which they asserted violated the First Amendment. The professors' claims were thus prudentially ripe for the reasons we have given. That completed Ethics Board proceedings might have exacerbated their injuries even further did not make their claims unripe as of the time the district court ruled. And whatever questions of abstention might have existed at that time—an issue the district court did not reach—the State conceded at oral argument that there is no basis for abstaining now given that the Ethics Board proceedings against Flaxman and Hagopian have concluded.

Because the professors' claims are ripe, we reverse the district court's dismissal of their complaint and remand for further proceedings.

**REVERSED AND REMANDED.**

BENNETT, Circuit Judge, dissenting:

Plaintiffs Abraham Flaxman and Amy Hagopian bring a putative class action against the Attorney General of Washington and Executive Director of the Washington State Executive Ethics Board ("EEB" or "Board") (collectively, "the State"), alleging that the Board's enforcement of Washington's Ethics in Public Service Act is unlawful. Because I conclude that Plaintiffs' operative complaint fails to plead an injury that confers standing, I respectfully dissent.

I

"Questions of standing and ripeness may be raised and considered . . . sua sponte." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1119 (9th Cir. 2009). The burden of establishing standing falls on the party invoking federal jurisdiction, and the burden of establishing ripeness falls on plaintiffs. *Meland v. Weber*, 2 F.4th 838, 843, 849 (9th Cir. 2021). In reviewing a district court's dismissal, including for lack of standing or ripeness under Rule 12(b)(1), "all factual allegations in [a plaintiff's] complaint are taken as true and all reasonable inferences are drawn in his favor."[1] *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013). "While we are mindful of the generous pleading standards that apply to

---

[1] I construe the State's attack on subject-matter jurisdiction to be facial, not factual. *See Safe Air For Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). As the district court noted, the State's "briefing does not challenge Plaintiffs' allegations and instead assumes that they are true." Thus, "[w]hether subject matter jurisdiction exists therefore does not depend on resolution of a factual dispute, but rather on the allegations in [Plaintiffs'] complaint." *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004), *overruled in part on other grounds by*, *Munoz v. Superior Ct.*, 91 F.4th 977 (9th Cir. 2024).

20                    FLAXMAN V. FERGUSON

civil rights plaintiffs, 'a liberal interpretation of a . . . civil rights complaint may not supply essential elements of the claim that were not initially pled'"—including "the essential elements of Article III standing." *Chapman v. Pier 1 Imps. (U.S.) Inc.*, 631 F.3d 939, 954 (9th Cir. 2011) (en banc) (omission in original) (quoting *Pena v. Gardner*, 976 F.2d 469, 471 (9th Cir. 1992) (per curiam)).

Ripeness has two components: constitutional ripeness and prudential ripeness. *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc). In many cases, constitutional ripeness "coincides squarely" with the injury-in-fact prong of the Article III standing inquiry, although "[s]orting out where standing ends and ripeness begins is not an easy task." *Id.* "The existence of standing turns on the facts as they existed at the time the plaintiff filed the complaint." *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 838 (9th Cir. 2007) (per curiam) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 569 n.4 (1992)). The effect of any subsequent events is addressed by the doctrines of mootness and ripeness. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189–91 (2000); *see also Thomas*, 220 F.3d at 1138 ("[R]ipeness can be characterized as standing on a timeline."). "Whether framed as an issue of standing or ripeness, an injury must involve 'an invasion of a legally protected interest that is (a) concrete and particularized[,] and (b) actual or imminent, not conjectural or hypothetical.'" *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1173 (9th Cir. 2022) (alteration in original) (quoting *Lujan*, 504 U.S. at 560).

In the First Amendment context, plaintiffs can allege injuries based on the state's "'retaliatory actions' after the fact for having engaged in protected speech," *id.* at 1174 (quoting *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474

(2022)), or "[p]re-enforcement standing injuries," *Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 59 (9th Cir. 2024). The former is a "retrospective theory requir[ing] us to disregard any threat of future enforcement," *id.* at 57, while the latter is "predicated on the anticipated enforcement of the challenged statute in the future and the resulting chilling effect in the present," *id.* at 59. "Pre-enforcement challenges to speech regulations and retaliation claims . . . carry different requirements for standing." *Twitter*, 56 F.4th at 1174. But in either case, "[m]ere '[a]llegations of a subjective "chill" are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.'" *Lopez v. Candaele*, 630 F.3d 775, 787 (9th Cir. 2010) (second alteration in original) (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972)).

Although the complaint does not list any causes of action, it invokes legal standards that apply to First Amendment retaliation claims by state employees and to pre-enforcement challenges. Under both frameworks, Plaintiffs' allegations do not suffice to plead an injury in fact. Even if subsequent events have altered the constitutional ripeness analysis, I believe that the complaint fails to establish Plaintiffs' Article III standing.**[2]**

---

[2] To evaluate standing, we may consider "all material allegations of the complaint and any other particularized allegations of fact, in affidavits or in amendments to the complaint." *Table Bluff Rsrv. v. Philip Morris, Inc.*, 256 F.3d 879, 882 (9th Cir. 2001). In concluding that Plaintiffs have alleged an injury in fact, the majority relies on the Board's final orders in the second of two proceedings against Flaxman and the proceeding against Hagopian—namely, that "the Ethics Board has found that both plaintiff professors violated Washington law, to the point that one was ordered to pay monetary penalties." Maj. at 15; *see also* Maj.

A

Plaintiffs' allegations about harm from the Board's past and ongoing enforcement fall short of pleading an injury in fact. The retaliatory framework could be applied to these retrospective allegations by Plaintiffs: the Board's email searches chilled academic freedom under the First Amendment (and infringed unspecified privacy rights), and the Board's threats of penalties greater than $500 chilled speech (and violated the Eighth Amendment's prohibition on "excessive fines").

Plaintiffs' allegations of chilling fail to establish an injury in fact. The majority contends that "no authority required [Plaintiffs] to more specifically allege present or future chilling to demonstrate a [constitutionally] ripe dispute" under a retaliation theory. Maj. at 12. But *Twitter, Inc. v. Paxton*, 56 F.4th 1170 (9th Cir. 2022), to which the majority cites in this discussion, states that "the injury-in-fact element is commonly satisfied by a sufficient showing of self-censorship"—or at the pleading stage, sufficient allegations of self-censorship—"which occurs when a claimant is chilled from exercising *his* right to free

---

at 4, 11, 13. But both proceedings remained pending when Plaintiffs filed the First Amended Complaint, which is the operative complaint. (The first proceeding against Flaxman had terminated in his favor, without a finding by the Board that he violated Washington law.) While these subsequent events may be judicially noticed and inform the constitutional ripeness analysis, the standing analysis is limited to the operative complaint, as Plaintiffs did not provide the district court with "affidavits[ containing] further particularized allegations of fact deemed supportive of [their] standing." *Warth v. Seldin*, 422 U.S. 490, 501 (1975); *see also Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).

expression."[3]  *Id.* at 1174 (emphasis added) (quoting *Edgar v. Haines*, 2 F.4th 298, 310 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 2737 (2022)).  Although we "appl[y] the requirements of ripeness and standing less stringently in the context of First Amendment claims," *id.* at 1173–74 (alteration in original) (quoting *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010)), "vague" allegations about a "general possibility of retaliation"—that make no "claim about the chilling effect of the specific investigation at hand"—fail to allege chilling as an injury in fact, *id.* at 1175.

In this case, the excerpts below from the complaint are Plaintiffs' only allegations about First Amendment injuries from the Board's past and ongoing investigations:

- "Plaintiffs, like other faculty members, use email to develop and share their thoughts with one another.  The confidentiality of such discussions is vital to scholarship and fostering an atmosphere for learning.  The EEB's boundless examination of faculty email accounts interferes with the right to academic freedom protected by the First Amendment."

- "This overbroad email search chills academic discussions on the 'Faculty Issues and Concerns' mailing list and thereby deprives plaintiffs and other

---

[3] The majority's distinguishing of *Twitter v. Paxton* on its facts, Maj. at 14–15, does not change that Plaintiffs have failed to translate those factual differences into allegations establishing an injury in fact.

> subscribers of the mailing list of First
> Amendment rights."

- "**Setting penalties to chill protected
  speech** . . . . The EEB's practice in
  setting penalties contravenes the
  'excessive fines' clause of the Eighth
  Amendment and chills academic
  discussions on the 'Faculty Issues and
  Concerns' mailing list. The EEB has
  applied these practices to plaintiffs . . . ."

- "Does the practice of the EEB to
  rummage through email to hunt for
  potential violations of [Wash. Rev. Code
  ch.] 42.52 encroach on academic freedom
  in violation of the First Amendment?"

- "Does the practice of the EEB to impose
  significant monetary penalties for the use
  of state resources for private benefit
  deprive subscribers to the 'Faculty Issues
  and Concerns' mailing list of First
  Amendment rights when any potential
  use of state resources is financially
  inconsequential?"

- "Does the practice of the EEB to impose
  significant monetary penalties for
  forwarding an email to the 'Faculty
  Issues and Concerns' mailing list when
  the forwarded email contains an
  inconsequential solicitation for
  contributions deprive plaintiffs of First
  Amendment rights?"

- "Does the setting by the EEB of penalties that far exceed any loss and are intended to punish chill the exercise of First Amendment rights?"

Even taking these allegations as true and drawing all reasonable inferences in Plaintiffs' favor, I conclude these facts fall short of establishing concrete and particularized harm to Flaxman and Hagopian. Many allegations are made solely in reference to "unidentified members of the class to which [Plaintiffs] belong" (i.e., all mailing list subscribers), which cannot confer standing on Flaxman or Hagopian. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 n.6 (2016) ("That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong.'" (omission in original) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 40 n.20 (1976))). In fact, Plaintiffs never allege that *their own* speech or participation in "academic discussion" was chilled—let alone *how* their speech was chilled by the Board's email searches or proposed fines. At most, Plaintiffs make vague allegations about a general chilling effect, which does not suffice to confer standing.

To the extent that Plaintiffs claim that the Board's allegedly overbroad searches of their emails infringed their "right to privacy in th[ose] communications," any such intrusion is not a legally cognizable injury. Plaintiffs fail to identify a "legal wellspring" for any privacy interest in their state-provided email accounts that was violated by disclosure to the Board, whether under the United States Constitution or the Family Educational Rights and Privacy

Act (FERPA)[4] or another law. *Clark v. City of Seattle*, 899 F.3d 802, 810 (9th Cir. 2018). As the district court noted, FERPA's nondisclosure provisions protect the records of students, not faculty, and, in any case, provide no private right of action to remedy violations. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 278–79, 290 (2002). And as the district court also noted, the emails of public employees are public records under the Washington Public Records Act.[5] Wash. Rev. Code §§ 42.56.010(3), 42.56.070; *see also* Wash. Admin. Code § 292-110-010(4) (providing that there is "[n]o expectation of privacy" in "[e]lectronic records," including in state-provided email accounts, because "[s]uch records may be subject to disclosure under the Public Records Act, or may be disclosed for audit or legitimate state operational or management purposes"). "Where, as here, there is . . . a lack of any predicate legal violation, the injury-in-fact requirement is not satisfied." *Clark*, 899 F.3d at 810 (holding alleged disclosure of plaintiffs' personal

---

[4] The complaint alleges that because "Plaintiffs' email, as well as email of other faculty members, includes messages from students about matters protected from disclosure by FERPA," the Board's "unfettered examination of faculty email thus interferes with privacy rights established by FERPA." In opposing dismissal below, however, Plaintiffs stated that they were "not bringing an action to enforce FERPA" but "rel[ied] on the EEB's violation of privacy rights created by FERPA to demonstrate the importance of their rights trampled on by the EEB."

[5] Plaintiffs contend that their emails are not public records under the Public Records Act because the statute would not permit a request for *all* of an individual's emails and because the statute contains certain exemptions from public disclosure. But the possibility that the Board-reviewed emails could not be captured in a single Public Records Act request or that some would fall under the statutory exemptions does not change that Plaintiffs' emails are subject to public disclosure under the Public Records Act.

information in violation of unspecified privacy rights was not an injury in fact when plaintiffs were legally required to publicly disclose "much of the same information"). Thus, Plaintiffs fail to allege a legally protected privacy interest in their emails or any injury to such an interest.

As to Plaintiffs' Eighth Amendment claim, the complaint does not allege that the Board had levied any fine against Flaxman or Hagopian. Plaintiffs therefore have not pled an injury that confers standing for this claim.

B

Plaintiffs also fail to plead a pre-enforcement injury in fact. I agree with the majority that Plaintiffs' First Amendment challenges to the Board's policies—allowing anonymous complaints, searching faculty emails, policing of incidental fundraising requests, and setting penalties greater than $500—are better viewed through a pre-enforcement lens. Maj. at 10.

A pre-enforcement challenge is justiciable under Article III if there are "circumstances that render the threatened enforcement sufficiently imminent." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). The Supreme Court has outlined "three benchmarks to determine whether there is 'a credible threat of enforcement'":

> (1) a plaintiff must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest," (2) a plaintiff's intended future conduct must be "arguably . . . proscribed by [the law]" it

> wishes to challenge, and (3) the threat of
> future enforcement must be "substantial."

*Seattle Pac. Univ.*, 104 F.4th at 59 (omission in original) (quoting *Susan B. Anthony List*, 573 U.S. at 161–62, 164). Although pleading a threat of enforcement sufficient for an Article III injury usually "requires the 'when, to whom, where, or under what circumstances' the plaintiff plans to violate the law," when "a plaintiff has previously engaged in conduct that would violate the challenged law, we have relaxed the requisite level of detail." *Id.* (quoting *Unified Data Servs., LLC v. FTC*, 39 F.4th 1200, 1211 (9th Cir. 2022)). Even assuming this relaxed standard applies, I believe Plaintiffs' allegations fall short.

First, Plaintiffs' allegations of their "intention to engage in a course of conduct arguably affected with a constitutional interest" are lacking. *Susan B. Anthony List*, 573 U.S. at 161 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). Plaintiffs seek to compare their case to *Seattle Pacific University v. Ferguson*, 104 F.4th 50 (9th Cir. 2024), in which we held that a private Christian university had sufficiently alleged an injury in fact in its pre-enforcement First Amendment challenge to an employment antidiscrimination law. *Id.* at 55, 59. Given that the university's employment decisions were "plainly affected with First Amendment interests," "[t]he real question [wa]s whether [the university] ha[d] sufficient intention to act." *Id.* at 59. We determined that allegations that the university's board had "voted to retain the existing employee conduct policy" and that the university would lose its religious affiliation if it acted otherwise "evidenced a sufficient intention to continue" its course of conduct. *Id.* at 59–60. Plaintiffs' attempted analogy highlights the deficiency of

their complaint. Sending messages to a mailing list is "plainly affected with First Amendment interests," so similarly "[t]he real question" here is whether Plaintiffs have pled a sufficient intention to act. *Id.* at 59. The complaint alleges only that "Plaintiffs serve as the two primary volunteer moderators of the mailing list" who "seek to maintain . . . an active discussion of higher education issues and faculty rights." Contrary to the majority's characterization, Maj. at 10, the complaint lacks any facts about Plaintiffs' continued intentions to serve as moderators of the list or even to send emails to the list.[6]

Even if Plaintiffs could meet their burden on the first prong, the complaint has no allegations relevant to the second prong—that Plaintiffs' "intended future conduct is 'arguably . . . proscribed by [the policies]' they wish to challenge." *Susan B. Anthony List*, 573 U.S. at 162 (omission in original) (quoting *Babbitt*, 442 U.S. at 298). "The concept of 'intention' is more counterfactual than practical": an "intention to engage in the proscribed conduct, were it not proscribed"—i.e., self-censorship—works just as well as a "plan to break the law." *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 488 (9th Cir. 2024) (citing *Bland v. Fessler*, 88 F.3d 729, 737 (9th Cir. 1996)). But to assert self-censorship, a plaintiff still must "specifically plead[] his intent and allege[] corroborating past practice." *Id.* Again, the complaint does not allege any facts about Plaintiffs' continued intentions to email the list, let alone their

---

[6] The majority points out that the State does not challenge Plaintiffs' pre-enforcement standing in this way, Maj. at 14, but the State's position is that this case is not a pre-enforcement challenge in the first place. In any event, we have "an independent obligation to assure that standing exists" because it is an Article III jurisdictional requirement. *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).

intentions to send—or to stop sending—messages
containing fundraising requests or anything else that might
subject them to the challenged Board policies. Without
allegations supporting the first two prongs, Plaintiffs
necessarily fail to allege a sufficient threat of future
enforcement.

As the majority notes, the Supreme Court has explained
that "past enforcement against the same conduct is good
evidence that the threat of enforcement is not 'chimerical.'"
Maj. at 11 (quoting *Susan B. Anthony List*, 573 U.S. at 164).
But alleging past enforcement does not relieve pre-
enforcement plaintiffs of their burden to allege facts about
their future conduct. Even in First Amendment pre-
enforcement challenges featuring "a history of past
enforcement," the Supreme Court and our court have looked
to the pleadings for "specific statements [plaintiffs] intend to
make in [the] future" or specific actions plaintiffs intend to
take in the future. *Susan B. Anthony List*, 573 U.S. at 161,
164 (holding two petitioners alleged a "credible" threat when
one "was the subject of a complaint in a recent election
cycle" and "[b]oth . . . pleaded specific statements they
intend to make in future election cycles"); *see, e.g.*, *Steffel v.
Thompson*, 415 U.S. 452, 456, 459 (1974) (holding
petitioner alleged a credible threat when he "alleged in his
complaint" that he had been warned by police to stop
handbilling at a shopping center at the risk of prosecution
and that "he desired to return to the shopping center to
distribute handbills"); *Tingley v. Ferguson*, 47 F.4th 1055,
1067 (9th Cir. 2022) (holding plaintiff alleged a "genuine"
threat when his "complaint . . . specifically alleged [how his]
past work with clients and expectations for future work with
clients . . . show a plan or desire to violate [the] law");
*Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676

F.3d 829, 836 (9th Cir. 2012) (holding plaintiffs alleged a "genuine threat" when they alleged that "they . . . used marijuana in violation of the [challenged law] countless times, and plan to continue to do so . . . by purchasing and consuming marijuana"). By contrast, Plaintiffs' complaint contains no allegations about their future conduct. There is nothing to read in a "charitable light." Maj. at 14.

II

The district court dismissed without prejudice for lack of subject matter jurisdiction based on the constitutional and prudential unripeness of Plaintiffs' claims. The district court did not dismiss with leave to amend, although Plaintiffs do not appear to have asked for another opportunity to amend their complaint, whether in their opposition to the motion to dismiss or in their opening brief on appeal. Because I agree with the district court that the complaint fails to allege a constitutionally sufficient injury, I would affirm in part on that basis, without reaching prudential unripeness. Moreover, facts on the ground material to the prudential ripeness analysis have changed during the pendency of this appeal. Thus, I would also reverse in part and remand to allow Plaintiffs to amend their complaint.

"[E]ven if Plaintiffs did not adequately raise the district court's failure to grant leave to amend in their opening brief, our waiver rule is simply a 'rule of practice,' not a jurisdictional rule." *Unified Data Servs.*, 39 F.4th at 1213 (M. Smith, J., concurring in part and dissenting in part) (quoting *Krause v. Sacramento Inn*, 479 F.2d 988, 989 (9th Cir. 1973)). "[W]e can exercise our discretion to overlook it when a 'detailed discussion' of an argument 'is unnecessary' and the appellee is not prejudiced." *Id.* (quoting *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 940 n.5 (9th Cir. 2008)).

When Plaintiffs filed the operative complaint, the Board's proceeding against Hagopian and second proceeding against Flaxman remained pending. The Board dismissed the first proceeding against Flaxman on October 13, 2023, three days before Plaintiffs filed the action on October 16, 2023. The Board dismissed the second proceeding against Flaxman on May 10, 2024, nine days after Plaintiffs filed their opening brief on appeal. On October 28, 2024, the Board issued a final order in Hagopian's proceeding, finding that she had violated the Ethics in Public Service Act and levying a $750 fine. Dkt. No. 28.

Allowing Plaintiffs to amend their complaint would not prejudice the State. In light of the final order in Hagopian's case, the State requested in a Federal Rule of Appellate Procedure 28(j) letter that we "remand Professor Hagopian's case to the district court with instructions to permit filing of a Second Amended Complaint, raising any additional claims or factual allegations Appellants deem appropriate based on the Order." Dkt. No. 28. The State confirmed this position at oral argument. Oral Argument at 19:52–20:01. Although Plaintiffs maintain that their claims are constitutionally ripe as alleged, Dkt. No. 29, their counsel stated at oral argument that if allowed to amend the complaint, Plaintiffs would add allegations about injuries specific to Flaxman—including speech that he has changed or forgone because of the challenged policies, Oral Argument at 8:25–9:33. In light of the parties' positions, I would remand for Plaintiffs to amend their complaint.

\*     \*     \*

Because Plaintiffs' injuries as alleged—whether analyzed under the pre- or post-enforcement framework—

do not confer standing, I would affirm the district court's dismissal but remand with instructions to grant leave to amend. The law does not demand much of First Amendment plaintiffs, especially those bringing pre-enforcement challenges, but Flaxman and Hagopian needed to say more here. I therefore respectfully dissent.